BANK OF BRITISH COLUMBIA *v*. MARSHALL and others.

*(Circuit Court, D. Oregon. March 21, 1882.)*

1. PLEDGE.
   Whether a transaction by which personal property is given as security for a debt or an engagement is a pledge or a mortgage may be a question; but the law, in case of doubt, favors the conclusion that it was intended as a pledge.

2. PLEDGEE—RIGHTS AND DUTIES OF.
   Although the pledgee is ordinarily entitled to the possession of the pledge, and therefore bound to use due diligence to preserve it from loss or injury, yet the rights and obligations of the parties to a pledge may be modified by special agreement, and then they are to be measured and ascertained by the particular intent of the parties, rather than any general rule applicable to a simple and unqualified pledge; and such intent may be gathered from the circumstances of the transaction, including the conduct of the parties to the pledge during its continuance, as well as their express agreements.

3. SAME—CASE STATED IN OPINION.
   M. & Co. were wheat dealers in Portland, and purchased wheat from the interior, and stored it in certain warehouses on the river front for sale to shippers, upon which the B. of B. C. from time to time made advances under a written contract that it should be secured by the delivery of the warehouse receipts therefor, with a power of sale in case of default—such receipts containing a clause that in case of "flood" the property was at the risk of the "owner." The advances were repaid from time to time as M. & Co. disposed of the wheat with the consent of the B. of B. C., but while a portion of it was still in the

warehouse it was injured by a rise in the Wallamet river, and while M. & Co. were assuming to care for it. The security for this reason proving insufficient to satisfy the claims of the B. of B. C., it brought this action to recover the balance due, and the defendants set up the loss by the injury to the wheat as a counter-claim thereto. *Held*, that the transaction was essentially a pledge, and the wheat remained the property of M. & Co.; but that, notwithstanding this, it appears that it was the intention and understanding of the parties that M. & Co. should care for the wheat in case of flood, and therefore the plaintiff was not liable for the loss.

4. QUESTIONS OF FACT—DISCRETION OF COURT.

It is in the discretion of the court to submit to or withhold from the jury a particular question of fact.

5. SAME—FINDING THEREON—EFFECT OF.

The court being of the impression that upon the written contract of bailment, and the conduct of the parties under it, as testified to by the defendant M., that the plaintiff was not bound to care for the pledge, instructed the jury to find a verdict for it for the balance due; and also instructed them to find whether the plaintiff was guilty of negligence in respect to the wheat, assuming that it was its duty to care for it as a pledgee in unqualified possession. The jury, in addition to the general verdict for the plaintiff, answered the particular question in the negative. The defendants moved for a new trial. *Held*, that the special finding was a fact in the case to which the court must give legal effect in any stage thereof, and that, therefore, the motion must be denied, even if the court is now satisfied that its instruction to the jury, as to which of the parties was bound to care for the wheat in case of flood, is erroneous, because it appears from such finding that the plaintiff, if even bound to care for the pledge, was not guilty of negligence, and therefore is not liable to the defendants for the loss sustained by the injury to it in any view of the matter; and also that it is not an error, if error at all, of which the defendants can complain, that the court assumed in its charge to the jury that the uncontradicted testimony given in the case by one of them was true.

Action for Money.

*W. H. Effinger* and *Joseph N. Dolph*, for plaintiff.

*H. Y. Thompson* and *George H. Williams*, for defendants.

DEADY, D. J. On September 27, 1880, the plaintiff was a foreign corporation doing a banking business at Portland, Oregon, and the defendants George Marshall and J. M. Ten Bosch, as George Marshall & Co., were engaged in the business of buying and selling wheat at the same place. They usually purchased wheat from the dealers and producers in the interior of the state, and shipped it in sack by boat and rail to Portland, where they stored it in the warehouses on the river front until disposed of for shipment abroad. When so disposed of, the vessels carrying the grain were usually loaded directly from the warehouse.

On that day, the defendants being desirous of procuring money from time to time to be used in their business during the wheat season, and the plaintiff being also desirous of furnishing the same, the

parties came to an understanding, in pursuance of which the defendants signed and delivered to the manager of the plaintiff a printed letter, addressed to and previously prepared by him, to the effect following:

"In consideration of advances made and to be made to us from time to time, we hereby agree to repay the same, with interest thereon at the rate of ten per cent. per annum; and we further agree that all moneys and securities for moneys, warehouse, shipping, or other receipts or other securities, which may from time to time be handed in to you by us, whether indorsed over or simply delivered, shall, during the whole time they are in your possession, stand to you as security for any balance that may then be due from us to the said Bank of British Columbia as for said advances or otherwise; we hereby giving to you, for said bank, a lien not alone upon the moneys or other securities now in your hands, but also upon all such to be hereafter and hereunder delivered to you.

"We hereby irrevocably authorize and empower you, for the said bank, to sell and dispose of all such personal property, or any part thereof, at public or private sale, after the expiration of ten days' notice to us, and from the proceeds arising therefrom to pay the principal and interest, and all charges that shall be then due, and the costs of sale, and the balance, if any, to pay over to us or our representatives on demand."

Then follows a clause stating that "by the schedule hereto annexed we [the defendants] enumerate the securities referred to herein."

The proposition contained in the letter was accepted by the plaintiff. The schedule referred to is written below the letter upon the same sheet, and simply consists of a list of various lots of wheat and flour, the warehouse receipts for which were issued and delivered by the warehouseman to the manager of the plaintiff by direction of the defendants, and of certain promissory notes made or indorsed by them to the plaintiff. The first entry in these schedules is dated September 28, 1880, and reads, "5,272 sks. wheat; No. R[eceipt] 99; Greenwich" [dock]; and the second is dated October 1, 1880, and reads, "1,630 sks. wheat; No. R. 105; Pacific." The last one is dated February 2, 1881. Between these dates the defendants caused to be issued and delivered to the plaintiff's manager warehouse receipts from Portland warehousemen for 90,484 sacks of wheat, 13,096 half sacks of flour, and also the promissory note of the defendant Marshall for $1,000, and that of —— Lent for $275, from which the bank realized the sum of $192,745.30. During the same period the plaintiff advanced to the defendants sums of money which, with the interest charged there, amount to $204,943.48. And

this action is brought to recover the difference between the amount realized from the securities and the account for money loaned—namely, $12,198.18.

The defendants, by their answer, allege that this wheat was "deposited" with and "pledged" to the plaintiff as security for the advances aforesaid, and it carelessly and negligently caused said wheat to be stored upon the lower tier of certain Portland wharves, known as the Pacific, Jones', and Smith's wharves, at a place where the Wallamet river was accustomed to overflow; that about the middle of January, 1881, it did negligently permit 27,690 sacks of said wheat, of the value of $47,501.76, to be damaged by a rise in the water of said Wallamet river, whereby the value thereof was diminished by $20,046.75; and pleaded the same as a counter-claim against the demand of the plaintiff, and pray judgment against the bank for the balance of $8,748.57.

The answer also contains allegations to the effect that certain of said securities were sold by the plaintiff without notice to the defendants, and that a portion of the wheat represented by said securities was sold for less than its fair market value, whereby the latter were damaged in the additional sum of $814.20. But on the trial these allegations were abandoned.

The plaintiff replied and denies that the defendants ever deposited "with or pledged" to the plaintiff the property mentioned in the schedules aforesaid; denies that it stored the wheat on said wharves carelessly or at all, or so neglected to care for it while there, or that the defendants suffered any damage by the negligence of the plaintiff concerning said wheat, and alleges that the warehouse receipts for said wheat were issued and delivered to the plaintiff's manager, W. W. Francis, in his own name, who thereupon indorsed them to the plaintiff, who thereby acquired, under and by virtue of the stipulations contained in the letters aforesaid, "a lien as by mortgage or hypothecation upon the wheat represented" by them; that the defendants selected the wharves upon which said wheat was stored and stored the same thereon, and had the same in their "actual possession" all the time it was so stored, and cared for it as they could or thought best, to prevent it from being injured by a rise in the river, and that the plaintiff was under no obligation to take any care thereof; that in January, 1881, the Wallamet river "suddenly and unexpectedly rose to a great and unusual height," by means of which said sacks of wheat were damaged as alleged without the negligence or fault of any one.

On the trial the defendant Marshall testified, in substance, that when he proposed to Mr. Francis to open an account with the plaintiff, and give wheat receipts as security for advances, the latter said that he would take such receipts if issued to him directly by good warehousemen in Portland, but none other; and on being asked if receipts issued by Capt. George Flanders, of the Greenwich dock, and Mr. Z. J. Hatch, of the Pacific docks,—which phrase colloquially included the Jones and Smith wharves, aforesaid,—were good, he answered they were; that when and as the defendants sold wheat for shipment, the receipts for which had been issued to Mr. Francis, they obtained an order from the plaintiff to the warehouseman for the removal of the same, and as soon as it was delivered to the buyer on the wharf or on shipboard they delivered the money or bills of lading received therefor to the plaintiff, and received from it the warehouse receipts, which they surrendered to the warehouseman who issued them; that on the eleventh, twelfth, thirteenth, and fourteenth of January the water rose in the Wallamet river until it was within 17 inches of the lower tier or floor of the Pacific docks, and that in the afternoon of the latter day it was first ascertained from the dalles that the Columbia river was rising, and that it was quite probable that the wheat was in danger, but it was too late to remove it with the means at hand; that Marshall watched the rise in the river day and night, and was of the opinion that the wheat was not in danger—at least to justify the expense of its removal—until the unexpected rise in the Columbia was heard from, and that he then communicated the news to Mr. Francis and conversed with him on the subject, who told him that he had no suggestions to make, whereupon Marshall commenced to remove the wheat as quickly as he could to the Greenwich dock, a distance of over a mile, but only succeeded in saving 1,500 sacks before the wharf overflowed on the evening of the fourteenth of January and prevented further operations.

It is a matter of common knowledge and general notoriety in this country, and was so assumed by counsel in their arguments and by the court in its charge to the jury, that the Columbia river does not rise in the winter season, but is generally then at a lower stage than its southern tributary, the Wallamet, and that the sudden overflow of the latter on the Pacific docks on the evening of January 14th was largely due to the unprecedented rise in the Columbia, which, by that time, had reached the mouth of the Wallamet and backed up the water therein.

It was also generally known and admitted that for some days before January 14th telegraphic communication up the Columbia had been suspended by the falling of the wires from an extraordinary sleet storm, and that, therefore, the rise in the Columbia and the unprecedented warm rain to the eastward of the Cascade mountains, which produced it, were not known in Portland until the afternoon of January 14th, when a rise of some eight feet had already passed the dalles —a distance of about 100 miles east of the mouth of the Wallamet.

Receipts were issued to Mr. Francis by the direction of the warehouseman of the Pacific docks for the 1,500 sacks of wheat removed to the Greenwich dock, and the wheat was afterwards sold by the plaintiff on due notice to the defendants, and the net proceeds applied on their account. The sacks of damaged wheat were afterwards removed from the Pacific docks, and the contents poured out and dried by Marshall with the consent of the plaintiff, and then sold by the latter, upon due notice to the defendants, and the net proceeds applied in the same way. The receipts given by the Pacific docks to the plaintiff's manager were to this effect: "Received of W. W. Francis, manager, sacks of wheat for account of W. W. Francis, manager," upon the conditions, among others, that storage is paid each month, that damage by flood is at owner's "risk," and that the receipt is returned before delivery made. Mr. Francis died before the trial came off, and his testimony was not heard, and the defendant Ten Bosch had removed to Liverpool without leaving his deposition, so that the testimony of Marshall was the only evidence, outside of the writings, as to the conversations or intercourse between the plaintiff and the defendants on the subject of the action; nor was there any evidence in the case tending to show that the defendants, prior to this action, ever claimed or asserted that it was the duty of the plaintiff to care for the wheat.

On the argument of the case it was contended for the plaintiff that the issue and delivery of the warehouse receipts, under the letter of the defendants, constituted a mortgage of the property therein described to the plaintiff, by which the right of property in the grain was vested in it, while the possession, with the corresponding duty of caring for it in case of a flood or other danger, remained with the defendants. On the contrary, the defendants insisted that the plaintiff thereby became the pledgee of the property, with the control of the possession thereof, and was, therefore, bound to the use of reasonable care and diligence to prevent it from being injured; and

that, having neglected to do so, it was responsible for the injury thereto. The court charged the jury that, strictly speaking, the transaction was neither a mortgage nor a pledge, but in its essentials partook more of the character of the latter than the former; that taking the writing given by defendants to the plaintiffs, and construing it by the light of the surrounding circumstances, and the conduct of the parties under it, as shown by the warehouse receipts, and the uncontradicted testimony of the defendant Marshall, it appears that it was the intention of the parties that the property in the wheat should remain in the defendant, and that the possession thereof was given to the warehouseman as the bailee and agent of the plaintiff, and subject to its control, for the purposes for which the receipts were issued to it; but that the grain, while in the possession of the warehouseman, as aforesaid, was held by him at the risk of the owner, in case of flood, who must, therefore, bear the loss occasioned thereby, and accordingly directed the jury to find a verdict for the plaintiff for the amount claimed by it. And the court also said to the jury that the parties, both in the pleadings, evidence, and argument, having made the question whether the plaintiff was guilty of negligence or not, and it being desirable that any question of fact in the case that might be material to its correct determination, upon either construction of the contract or transaction contended for, should be settled by the jury, so as to avoid the delay and expense of a new trial in case the construction now adopted should not be approved by the appellate court, it would and did submit to them the question whether the plaintiff, assuming it to have been a pledgee of the property, and bound to use ordinary care and diligence to prevent it from being injured by the flood, was, upon the evidence, guilty of negligence in the premises. The jury found a verdict for the plaintiff, as directed, and answered the question submitted in the negative; and the defendants now move for a new trial for error of law occurring at the trial and duly excepted to, and because the verdict is against the law and evidence.

The error excepted to is so much of the charge as "was given in relation to the legal effect of the contract and the possession of the wheat."

On the argument of the motion no question was made by counsel for the defendants as to the sufficiency of the evidence to support the verdict and the finding; but the latter was treated as something immaterial. It was insisted, however, that the court not only erred in construing the contract, but also in assuming that the testimony of

the defendant Marshall, as to the conduct of the parties under it, was true, instead of leaving it to the jury. No such objection to the charge was made at the time, and therefore is not now entitled to be heard. If it had been made before the jury retired, the court, if it was thought material, could have easily obviated it by saying to the jury: "If you believe the testimony of the defendant Marshall as to the conduct of the parties to this transaction in relation to the deposit, care, and custody of this wheat while upon the Pacific docks your verdict must be for the plaintiff." The result must have been the same. It was assumed in the argument, by counsel for both parties, that his statements in this respect were correct, and certainly the defendants ought not to complain if the court did likewise. Nor do I think the court, in construing this written contract for the jury,—ascertaining what the parties intended by it,—erred, as against the defendants, in reading it by the light of the unquestioned conduct of the parties under it, as they then mutually understood it, as shown by the uncontradicted testimony of one of them.

If there is any error in the charge, it must be in the conclusion to which the court came concerning the legal effect of the contract and the acts of the parties thereunder, to which the defendants duly excepted. Whether a transaction amounts technically to a mortgage or a pledge is sometimes a nice question; but the ultimate object of the inquiry is not so much to name the transaction as to ascertain what was the intention and understanding of the parties to it; and therefore such intent, when ascertained, ought to control. In the case of a pure pledge the creditor takes the possession, actual or constructive, of the goods, while in that of a mortgage there is a transfer of the title to him, but not the possession. 2 Kent, 577, note 1; Story, Bail, §§ 286–7, 297. In all cases, then, where personal property is given as a security for a debt or engagement, accompanied by a change of possession, either actual or constructive, the transaction better comports with the character of a pledge than a mortgage; and where the transaction imports nothing more than giving a security without a sale or change of title of the property, the law favors the conclusion that it was intended as a pledge and not a mortgage. Schouler, Bail, 163. But the rights and obligations of the parties to a pledge may be modified indefinitely by special contract between them, as that the pledge shall be kept, until the default of the pledgor, at some particular place, or by some particular person. Id. 205; *St. Losky* v. *Davidson*, 6 Cal. 647.

My impression still is that the transaction between the plaintiff and the defendants is in its essential features a pledge. There was no sale of the property or transfer of the title to the plaintiff, but a deposit thereof with the warehouseman of the Pacific docks as a security for money loaned to the defendants. The term "mortgage" is not used in the contract, neither does it contain any language which indicates in the least a sale or transfer of title. The stipulation for a lien, though unnecessary in case of a pledge, is in harmony with the idea of one, of which it is an essential feature; but inconsistent with the idea of a mortgage, which goes further and passes the legal title. The power of sale is also consistent with the purpose to constitute a pledge, of which it is a legal incident, although not an unusual provision in a mortgage.

The issue and delivery of the receipt was only a mode of furnishing the plaintiff with the evidence of the deposit of the pledge at the place agreed upon, and the right to the possession of the same and to dispose of it according to the terms of the bailment. But from the nature of things it was a pledge qualified by the situation and subject of the contract and the conduct of the parties under it, so that the custody of the property, instead of being actually or absolutely in the plaintiff, remained in the warehouseman, subject to its control for the purposes of the contract, and while there at the risk of the "owners"—the defendants—in case of flood.

The contract of the warehouseman with the plaintiff, as appears by his receipt, provided that the wheat while there should be at the risk of the "owners" as to "flood," and this receipt was issued with this stipulation, and delivered to the plaintiff at the instance and by the direction of the defendants.

The defendants then claimed and still claim that they were the owners of this wheat, and there is no doubt in my mind but that they were. This being so, and nothing appearing to the contrary, they must have been understood, upon delivering the receipts to the plaintiff, as taking the risk of floods while the wheat was owned by them and stored in that warehouse, even if there was no other fact in the case tending to prove that such was the understanding.

But admitting that the court erred in its charge to the jury in this respect, and that it should have charged the jury, as contended by the defendants, that the plaintiff was an unqualified pledgee of the wheat, and as such bound to use ordinary care and diligence to prevent it from being injured by the flood, still the motion for a new trial ought not to prevail, because it appears from the special find-

ing of the jury that even upon that theory of its liability the plaintiff was not guilty of negligence in the premises. To avoid this conclusion, counsel for the defendants assume that this finding is an immaterial matter, and therefore one that can have no weight in the consideration of this motion. Upon what ground this assumption rests does not appear. No authorities are cited or reasons given in support of it.

There is no doubt but that the court had authority to submit this question to the jury for its determination. Section 212 of the Or. Civil Code provides that the court "in all cases may instruct them, [the jury,] if they render a general verdict, to find upon particular questions of fact." And this special finding shall control any general one with which it is inconsistent. Id. § 213.

The submission of particular questions of fact to the jury is a matter wholly within the discretion of the court. *Am. Co.* v. *Bradford,* 27 Cal. 365; *Taylor* v. *Ketchum,* 5 Rob. 514; S. C. 35 How. 296.

This finding is, therefore, legally a part of the case, and must have such effect as it is entitled to in any subsequent proceeding therein. The question was one upon which the parties gave evidence and submitted argument to the jury. Upon the defendant's theory of the transaction—that it was simply a pledge, and therefore the plaintiff was bound to use ordinary care and diligence to save the grain from injury—the question was a material one, because they could not maintain their counter-claim for the injury to the wheat, even if the plaintiff was held to be the pledgee thereof, unless they also proved that such injury was the result of its negligence.

Suppose the question had not been submitted, and that the court should now be satisfied that the charge to the jury was erroneous, and that they should have been instructed that it was the duty of the plaintiff to care for the wheat; and suppose the court should also be of the opinion that according to the weight of the evidence given on the trial the plaintiff was not guilty of negligence,—the motion for a new trial would be denied. For the counter-claim of the defendants cannot be maintained upon any view of the law as to whose duty it was to take care of the wheat, unless the plaintiff was guilty of negligence. A new trial is never granted for an error occurring in the progress of the case when it is apparent to the court that upon a retrial the verdict must be the same. Thomp. Charg. Jury, 162.

But this is, if anything, a stronger case against the motion. For the jury, upon the question being submitted to them upon the whole evidence in the case, have found that there was no negligence. Nor

is there any complaint that this question of negligence was not fairly and fully submitted to the jury, or that the parties were not fully heard upon it or in any manner surprised by it. As has been said, the question was directly made by the parties in their pleadings, evidence, and arguments, and in my judgment it was really the only question in the case for the jury.

The motion must be denied and the plaintiff have judgment upon the verdict.